Filed 3/16/21  In re L.G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.G. et al., Persons Coming Under the Juvenile Court Law. | B305503 (Los Angeles County Super. Ct. No. 17CCJP02118A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SANDRA A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Kim L. Nguyen, Judge.  Dismissed in part and affirmed in part.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Sandra A. (mother) challenges the juvenile court's order made at the 12-month review hearing concerning her three children, L.G. (minor, born May 2009), David G., Jr. (David, born Sept. 2010), and J.G. (born Feb. 2013). (Welf. & Inst. Code, § 366.21, subd. (f).)[1] Specifically, she contends that insufficient evidence supports the juvenile court's determination that returning minor to mother would create a substantial risk of detriment to minor.

We dismiss that portion of mother's appeal concerning David and J.G. as mother did not raise any arguments in her opening brief regarding those two children. We affirm the juvenile court's order concerning minor.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Section 300 Petition*

On November 29, 2017, the Los Angeles Department of Children and Family Services (DCFS) filed a petition on behalf of the three children pursuant to section 300, alleging that the children needed the protection of the juvenile court because of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

domestic violence between mother and David G., Sr. (father).[2]
DCFS had obtained a removal order that allowed it to detain the
children from father.

*Arraignment and Detention Hearing*

The parties appeared for an arraignment and detention
hearing on November 30, 2017.  The juvenile court found
continuance in father's home was contrary to the children's
welfare, that substantial danger existed to the physical health of
the children, and there were no reasonable means by which the
children could be protected without removing the children from
father's custody.  The juvenile court ordered that the children
remain with mother on the condition that she not drive the
children while under the influence of marijuana.  It also ordered
mother not to discuss the dependency case with the children.

*Jurisdictional Disposition Hearing*

On February 2, 2018, the juvenile court sustained the
section 300 petition, declaring minor and her siblings to be
dependents of the court, and placed them in mother's home.
DCFS was ordered to provide family maintenance services to
mother.  Mother was granted a permanent restraining order
protecting her from father.

*Six-month review hearing*

For the six-month review hearing, DCFS reported that
mother had made a family plan for the two older children to
reside with a relative while she kept the youngest child with her.
Mother told the social worker that she kept in constant contact
with the older children and had enrolled herself and the children

---

[2]     Father is not a party to this appeal.

3

in counseling at their school. Mother's counselor verified working with the family weekly. DCFS recommended continued family maintenance services.

On August 10, 2018, the juvenile court found that continued jurisdiction was necessary, and continued the matter with orders for continued family maintenance.

*Section 342 Petition*

On October 14, 2018, the children were detained from mother. On that date, the social worker received a referral alleging physical abuse by mother of David.

The social worker went to the paternal grandmother's home to investigate the referral. The paternal grandmother said that she was the monitor for father's visits. She and mother exchanged the children at the Temple City Sheriff Station.

During the last exchange, the paternal grandmother noticed dried blood on David's nose. When the paternal grandmother asked him what had happened, David said that mother had slapped him on the face twice for misbehaving. The paternal grandmother went into the police station to report the incident.

The social worker then interviewed minor privately. She was reluctant to disclose that she or her siblings were physically abused by mother. Once the children were taken into protective custody, minor disclosed that mother hits David with a "chancla" (sandal) on his back and bottom when he misbehaves at school. She denied that mother hit her or her sister.

Minor was extremely tearful and visibly upset as she recounted the moment mother was taken into police custody. She said, "'It's David's fault that my mom got arrested.'" The social worker told minor that it was not the children's fault that mother

4

was arrested. Minor informed the social worker that mother always told them that if they said anything to the police and social workers, they would have to live in a foster home.

The social worker also interviewed David. He first stated that mother only hit him with a sandal on his lower back and buttocks. After several hours, David told the social worker that mother hits him in the face when he gets in trouble at school. On that day, he said a "'bad word'" and when mother heard him, she slapped him in the face twice, causing his nose to bleed. David said mother threw a tissue at him and told him to wipe up the blood. The social worker saw dried blood inside of the child's left nostril.

The social worker also spoke to Deputy Gonzalez at the Temple City Sheriff Station. Deputy Gonzales stated that the paternal grandmother brought the children to the Las Tunas Station to report that mother had physically abused David that day. David said that mother had slapped him in the face two times for misbehaving. The second slap caused the child's nose to bleed.

Deputy Gonzalez observed that the child had dried blood on his nose and a bruise on his left nostril. He stated that Deputy Rivera had detained mother in the back seat of the patrol car. As mother was being detained, she turned to David and shouted, "'You f***ing did this! Now because of you, you and your sisters are going to a foster home!'"

On October 16, 2018, DCFS filed a petition pursuant to section 342 alleging that the children needed the protection of the juvenile court because of mother's physical abuse of David.

Both mother and father appeared for an arraignment and detention hearing held the following day. At that hearing,

mother requested that the girls (minor and J.G.) be released into her care, as they were differently situated from David. The juvenile court denied her request, and detained all three children. The juvenile court granted DCFS discretion to release the children to any appropriate relative and set a jurisdictional hearing in December 2018.

*Jurisdiction/Disposition Report*

The November 29, 2018, jurisdiction/disposition report on the section 342 petition reiterated what mother had done and said to David.

Mother refused to provide law enforcement with her home address. The children had been placed with a maternal step-grandmother.

The children were interviewed in the home of their maternal step-grandmother. Minor told the social worker, "'I'm worried about my brother because he's really not behaving or listening to anyone.'" She also stated, "'When we were going to visit with our dad, we were getting ready and he [David] was watching TV. My mom told him to get ready and he wasn't listening at first. We were at the car and when my brother opened the trunk he said a bad word and my mom told him to get in the car and she went to smack him in the mouth, but she missed and hit his nose. She didn't mean to scratch his nose; it's just cause she has long nails.'"

The social worker asked minor if she had ever seen mother hit David before and she said, "'No.'" The social worker then asked what mother did to discipline David when he did not behave and minor said, "'She would put him on time out or send him to his bed.'" Minor denied that mother ever hit her or her sister.

When the social worker interviewed David, he denied that mother had slapped him. He said that mother made his nose bleed, but he forgot how. He admitted that someone told him not to talk about how mother made his nose bleed, but when asked who told him, he again said he forgot.

Five-year-old J.G. was also interviewed. She said, "'I worry about my brother cause sometimes he's bad.'" She disclosed that mother "always" hits him, sometimes with her hand or a belt.

Mother was also interviewed for the report. She described David as always being in trouble, and stated that his behavior was worse when he visited with father.

Mother explained what had happened on the day the children were detained. She said that on Saturday, she went to get each of them their own pumpkins so they could carve them. David was poking his sisters with the pumpkin knife so she took it away and told him he could not carve anymore. Mother's sister had baked cookies for everyone, but David had woken up early the next morning and ate all the cookies.

Mother said that later that day she herded the children into the car to visit with father. When David got to the car, he got his car seat from the trunk. He let go of the car trunk and said, "'Oh shit.'" Mother said she did not hear what David said so she asked him, but he would not tell her. Instead, he just smirked. He just kept smirking, so mother smacked him in the mouth, but when she did, he put up his arms to block the blow, and she ended up hitting his nose.

DCFS recommended that the children remain in placement, and the parents receive reunification services.

*Jurisdiction/Disposition Hearing*

On December 6, 2018, mother pled no contest to an amended section 342 petition.[3]

The juvenile court then proceeded into the dispositional phase of the matter. The children's attorney agreed with a suitable placement order for the children, even though the children wished to return to mother's home. Counsel also requested more intensive services for David.

Mother requested that the children be returned to her care. She objected to DCFS's request that she participate in a psychological evaluation, and the juvenile court determined that mother's mental health needs could best be addressed in individual counseling.

The juvenile court ordered the children removed from mother's custody and suitably placed. It ordered mother to complete a parenting course for children with special needs, and participate in counseling with a licensed therapist.

*Status Review Report*

On May 22, 2019, DCFS submitted its six-month review report to the juvenile court for the section 366.21, subdivision (e), hearing. Mother reported that she was in counseling at Arroyo Vista Family Health, but did not provide DCFS with the name of her therapist until late April 2019. She also reported that she

---

[3] As amended, the sustained section 342 petition provides that on October 14, 2018, mother slapped David's face, inflicting bruising and bleeding to his left nostril. "Such physical discipline was excessive and caused the child unreasonable pain and suffering. The mother's physical discipline of the child endangers the child's physical health and safety, placing" all three children at risk of suffering serious physical harm.

8

was receiving mental health services at Via Care. She began counseling there on March 8, 2019, but her therapist's last day working in that facility was on March 22, 2019. Although the social worker called numerous times, she was not able to determine if mother had been assigned another therapist. Mother said that she was an outpatient with the Department of Mental Health, and had been diagnosed with "'Major Depressive Disorder, Recurrent Episode, Moderate.'" She met with a licensed clinical social worker once a month. Unfortunately, the licensed clinical social worker would not share information about mother's treatment beyond the dates that she received treatment.

According to the DCFS social worker, mother was combative during most contacts with the social worker, and contacts usually ended with mother yelling and screaming and causing the office security to request she leave the office. During a discussion in late April 2019, the social worker asked mother about her housing, but mother was unwilling to confirm her current housing or address.

*Last Minute Information Report*

On July 16, 2019, DCFS reported that father was concerned with the maternal grandmother's ability to monitor mother's visits. According to father, the maternal grandmother was frightened of mother and did not want any problems with her. The maternal grandmother had texted father and stated that she hated monitoring the visits. In addition, there was an incident during a visit where mother's boyfriend became angry with the maternal aunt, and mother slapped him and told him to leave. The children were upset, and J.G. was crying. David told father that he was afraid something would happen to the maternal grandmother.

9

*Section 366.21, Subdivision (e), Hearing*

At the July 16, 2019 hearing, DCFS moved to admit its reports into evidence.

Mother then introduced her documentation, including a letter from Arroyo Vista indicating that mother had received therapy from April 3, 2018, through August 20, 2018. Mother had been diagnosed with "Major Depressive Disorder and Anxiety Disorder." The letter concluded by stating that mother would benefit from regular ongoing therapy to address her symptoms and needed to continue to work on her therapeutic goals. Mother also moved into evidence several letters from Via Care, summarizing efforts for her therapy, including a statement that mother had completed her therapy assessment on May 24, 2019, and was participating in weekly one-hour individual sessions.

In addition, mother offered an April 22, 2019, letter from the Los Angeles County Department of Mental Health, which provided that mother had been diagnosed with Major Depressive Disorder, and was receiving treatment. Her next scheduled appointment was for June 6, 2019.

Last, mother produced a letter from Barrio Action dated May 29, 2019, stating that she had enrolled in a 12-week parenting program, and had thus far attended seven sessions. She received a certificate of completion of parenting class dated July 2, 2019.

Mother's counsel informed the juvenile court that mother was seeking a home of parent order, or in the alternative, unmonitored visitation with the children. Mother then testified on her own behalf.

Mother testified that she understood her case was in dependency court because she hit her son, causing him to bleed.

10

She was in counseling, and had been diagnosed with depression and anxiety. She had been seeing one of her therapists for a month. Her other therapist she saw once every two months. She had been dealing with past trauma in therapy, and learned that she needed to spend more time outdoors.

Mother stated that at her visits she went to the park, Chuck E. Cheese's, and the movies with the children, as well as other activities. She also took them to the library so that they could improve their reading skills.

In addition, mother testified that she had been a stay-at-home mother for 10 years, and her children were everything to her. She promised that she would not repeat her mistake.

Mother testified that the paternal grandmother would say anything to get what she wanted, and she lied when she said the children told her that mother's boyfriend was present during the visits. Mother testified that she would not give the social worker her address because the social worker had threatened her prior roommate, and had given her address to father.

On cross-examination, mother was questioned about an incident when security had to be called to remove her from the DCFS office. Mother explained that she had complained that the social worker was not helping her. According to mother, the dispute with the social worker at the DCFS office was centered around the social worker not providing mother a receipt for a document mother gave to the social worker. Then, according to mother, the social worker told her that she was not going to do anything for mother, including approving funds for transportation. Mother began to raise her voice. She contended that she was in control, and that she was only raising her voice to

11

get someone's attention so that she could get a new social worker. Security was called because she was loud.

After entertaining closing argument, the juvenile court granted mother continued family reunification services and unmonitored visitation in a public setting.

*Status Review Report*

On December 24, 2019, DCFS reported that David had had ongoing issues with hitting other children and not following instructions at school.

In September 2019, the social worker attended a wraparound meeting with the service providers for David. Present at the meeting were mother, the caregiver, the three children, the maternal aunt, mother's parent partner,[4] and a child and family specialist. The team members stated that David was doing well at home and at school. As the meeting continued, the social worker asked if the team would be able to provide bunk beds and car seats for the children as the children were currently sleeping on mattresses on the floor. The parent partner stated that she would make a request for the bunk beds and car seats, but she could not guarantee anything.

Mother then stated that the request for the bunk beds and car seats had been pending for months. The social worker

---

[4] "Parent Partners have successfully navigated the [dependency] system and now work in partnership with DCFS to provide support, information and mentorship to parents who have recently lost custody of their children." (<https://dcfs.lacounty.gov/parents/parent-resources/dcfs-parent-services/parents-in-partnership/> [as of Mar. 9, 2021], archived at <https://perma.cc/BPN4-4TEC>)

12

explained that DCFS had to exhaust resources to see if the bunk beds and car seats could be obtained via a donation. Mother appeared angry, and accused the caregiver and social worker of lying. The social worker asked mother if a meeting could be scheduled to address her concerns rather than discussing them in front of the children. Mother told the caregiver, "'You lie and [the social worker] lies . . . to me so who is telling the truth,'" and the caregiver began to cry and said, "'I am trying to help you, I don't lie to you.'" The social worker asked mother to leave the meeting as the caregiver was crying and the children were present. Mother refused to leave, so the social worker asked that the children go to their bedroom.

Finally, mother left the meeting with her parent partner. The caregiver then told the social worker that mother had been upset since Friday when she went to the school for an event for David and the school refused to allow mother inside the school until it obtained approval from DCFS. The school contacted DCFS, which gave permission for mother to be present. The caregiver's adult daughter stated that while at the school event, mother became angry with the caregiver because she had not purchased the school tickets for the children's pizza and yelled at the caregiver while in the presence of the children.

The parent partner returned to the meeting without mother, and told the team that mother appeared to be bullying the caregiver. The caregiver cried and stated that mother blamed her for things; she tried her best to stay quiet, followed through on the visits, and allowed mother to take the children to the doctor. The caregiver stated, "'The mother tells me I have my parental rights and I can take them to the doctor and that is the way she is, she is angry and upset and wants things her way, like

13

the bunk beds and the car seats.  I told her I would buy the car seats at Walmart and she said no, [she did not] want car seats from Walmart and that is the way she is, she has to have things her way or she gets mad.'"

The wraparound members suggested that the caregiver not monitor visits for mother and mother's visits should not take place in the caregiver's home.

After speaking with the team and the caregiver, the social worker spoke to the children.  The children were upset, and minor and J.G. asked when they were going to see mother.  The social worker apologized to the children.

DCFS reported that mother received mental health services from January through December 2019 at Northeast Mental Health and met monthly with a psychiatric social worker.  Her last therapy session took place on December 9, 2019.  On December 12, 2019, the clinical supervisor said that mother had informed the clinic that she would no longer be attending their clinic.

In January 2019, mother had a psychiatric consultation, and the psychiatrist recommended psychiatric medication for her.  Mother declined and no further appointments with the psychiatrist were scheduled.

Mother received individual therapy with Via Care from May 2019 through August 2019.  According to the therapist's progress letter, mother had been participating in weekly individual therapy sessions consistently and was on track to complete the services.  During her time in therapy, her goal had been to increase her coping skills to regulate her mood.  She also received psychoeducation regarding trauma, healthy relationships, and generational patterns of abuse.  The therapist

recommended that mother continue behavioral health therapy to continue to engage in healthy coping and cognitive behavioral therapy.

Mother then attended individual therapy at Hillsides Baldwin Park office, and signed a release of information so that the social worker could speak with the clinic. The clinical supervisor stated that the therapy notes indicated that the therapist and mother were working on issues related to anxiety.

DCFS opined that mother still did not understand that her behavior was the reason her children were removed from her care. After all, in July 2019, mother stated she had hit David and, "'as a scolding,'" she had to attend parenting classes. When asked what she would do differently other than hitting David, mother stated, "'He was hitting the girls, he was fighting, you don't want me to punish him. I was trying to discipline him and nothing worked. I ran out of options. I would do the same thing as before even though I got arrested.'" And, during a meeting with the social worker and her supervisor in mid-December 2019, mother stated, "'The father is the one at fault for all of this case and that is the reason why we are all f***ed up.'"

DCFS recommended that mother participate in a psychological evaluation to assess what services and intervention might be best for the parents.

*Section 366.21, Subdivision (f), Hearing*

At the January 14, 2020, 12-month review hearing, mother requested that her visitation with the children revert to unmonitored. The children's counsel recommended that visitation remain monitored. The juvenile court ordered that mother have monitored visitation, and continued the matter for an evidentiary hearing.

*Last Minute Information for the Court*

On March 12, 2020, DCFS reported that, in general, the monitored visits between mother and the children went well. The children enjoyed their visits with mother. However, there was an incident at minor's school on January 25, 2020.

Minor had won second place at a science fair, and her school was holding an event to hand out prizes. The social worker contacted the school and informed it that mother could attend the ceremony. According to the caregiver and father, while at the school, the children had run to mother and had unmonitored contact with her. Father said that during the unmonitored visitation, mother interrogated the children and told them that father had cheated on her.

The social worker talked to mother's current therapist. When the social worker asked the therapist if they had addressed mother's conduct at the team meeting concerning the children, the therapist stated, "'We talked about it but I cannot disclose any information to you.'" When the social worker asked if anxiety was a trigger for mother's anger, the therapist reiterated that she could not disclose any information.

*Contested Section 366.21, Subdivision (f), Hearing*

On March 12, 2020, DCFS and mother moved various reports and documents into evidence.

Mother then called the maternal aunt as her first witness. She testified that it had been years since she had seen mother and the children together. She also stated that if the children were returned to mother, she would be able to offer mother any assistance she needed.

Mother testified next. She said she understood that the case was in dependency court because she had hit her son, and

16

she understood that that was the wrong thing to do. She had attended parenting classes and participated in therapy. She had also attended counseling sessions with three different therapists. The first time she switched counselors was because the sessions were too infrequent. Then she participated in a 12-week program, and she started with another therapist in October 2019.

Mother also stated that she enrolled in anger management. However, she had just enrolled, and had not actually attended any classes as of the day of the hearing.

On cross-examination, mother said that in her current therapy sessions she discussed missing her children and learning to talk without attitude and be friendlier.

At the conclusion of mother's testimony, the juvenile court entertained closing argument. Mother requested that the juvenile court find that DCFS had failed to make reasonable efforts to assist her. She also requested that the children be returned to her care, or, in the alternative, that her visitation with the children be liberalized. Counsel for the children requested continued reunification services for mother and that mother's visitation with her children be liberalized after she completed a certain number of anger management classes. Counsel concluded with "I do believe the court can find by [a] preponderance of the evidence a substantial risk of detriment to the children if they were returned to mother's care today." DCFS argued that it had made reasonable efforts, and agreed with the children's counsel that the children should not be returned to mother at that time.

Ultimately, the juvenile court found that DCFS had demonstrated by a preponderance of the evidence that there was a risk of harm of returning the children to mother because

mother had not yet learned to control her anger. In support, the juvenile court referenced the incident at the team meeting when mother lost control and accused the social worker and the children's caregiver of lying while the children were present, causing the caregiver to cry and upsetting the children. Additionally, mother's parent partner was concerned that mother was bullying the caregiver. The juvenile court stated, "And I think this actually goes to the heart of what the court has observed in court, which is that whenever the mother—when there are criticisms of the mother, the mother reacts and everyone is wrong, she is defensive, she engages in conduct that is not productive, and that she effectively bullies other people."

The juvenile court then adopted the suggestion of the children's counsel, and liberalized mother's visitation to unmonitored after she completed six anger management sessions. DCFS was given discretion to limit mother's visitation to monitored if there were any incidents of inappropriate discussions of the case with the children or incidents of anger by mother.

*Appeal*

Mother timely filed her notice of appeal, challenging the juvenile court's March 12, 2020, order concerning all three children.

## DISCUSSION

I. *Forfeiture*

Mother filed a notice of appeal concerning all three children. However, her opening brief only discusses minor. In fact, mother specifically argues that only minor should be returned to her because she is in a different position than her siblings. Mother's failure to make an argument concerning David

18

and J.G. forfeits any argument concerning them.  (*In re Daniel M.* (2003) 110 Cal.App.4th 703, 707, fn. 4.)  It follows that mother's appeal concerning these two children is dismissed.

II.  *Substantial evidence supports the juvenile court's determination that return of minor to mother created a substantial risk of detriment to minor*

      A.  <u>Applicable law and standard of review</u>

At the 12-month review hearing, which is a permanency hearing, the juvenile court "shall determine the permanent plan for the child, which shall include a determination of whether the child will be returned to the child's home and, if so, when
 . . . .  After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court it finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment."  (§ 366.21, subd. (f)(1).)

"'At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. . . .  At 6–, 12–, and 18–month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.'  [Citation.]"  (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 (*David B.*).)

The "substantial risk of detriment" standard "must be construed as a fairly high one.  It cannot mean merely that the

19

parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B.*, *supra*, 123 Cal.App.4th at p. 789.)

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services.  [Citations.]  The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement. [Citations.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

"We review the juvenile court's finding of detriment for substantial evidence.  [Citations.]  Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination.  We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court.  [Citations.]" (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864–865.)

B. <u>Analysis</u>

Applying these legal principles, we conclude that ample evidence supports the juvenile court's finding that minor would have been at substantial risk of serious physical harm if returned to mother.  DCFS filed a section 300 petition at the onset of these proceedings because of domestic violence between mother and father.  During the pendency of these proceedings, the children were detained from mother because of her physical abuse of David.  While these proceedings were continuing, mother repeatedly demonstrated that she had not gained any insight into her anger management issues.  She was repeatedly combative with the DCFS social worker.  The maternal grandmother was

20

afraid of her. During a wraparound meeting, mother got angry and accused the caregiver and social worker of lying; in fact, mother's parent partner believed that mother was bullying the caregiver. In July 2019, mother still did not have a grasp on why her children had been detained from her. And, by the time of the March 12, 2020, hearing, although mother had enrolled in anger management, she had not actually attended any classes. While we applaud mother's efforts in therapy, we cannot agree that her issues have been resolved such that minor could have been returned to her custody safely.

On appeal, mother agrees that there was substantial evidence to support the juvenile court's continued removal of David and J.G. However, she claims that minor is differently situated from her younger siblings and could therefore be safely returned to mother's custody. Specifically, she contends that any risk of physical abuse to minor is low because (1) she had never been the target of physical abuse, (2) she lacked the behavioral issues that contributed to David's abuse, and (3) she was older and capable of reporting any abuse to father or any other relatives. We cannot agree.

Even though minor may not have been the target of mother's physical abuse, it is undisputed that mother physically abused David. (See *In re D.B.* (2018) 26 Cal.App.5th 320, 330–331 [evidence that parents hit child with a belt four times a month, leaving him with wounds in different stages of healing, supported juvenile court's finding that child's sibling was at substantial risk of serious physical abuse].) And, there is ample evidence of mother displaying inappropriate angry behavior at persons other than David, whose "negative behavior," according to mother, "was undeniably a contributing factor." Mother

displayed inappropriate behavior to the caregiver and the social worker.  In addition, the children reported seeing mother strike her boyfriend during a monitored visit.  Under these circumstances, the fact that minor was articulate and could report any abuse should it occur is not grounds for reversal.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 165 [juvenile court need not wait until a child is abused or injured before taking steps to protect the child].)

*In re Hailey T.* (2012) 212 Cal.App.4th 139 does not compel a different result.  In that case, after an infant presented with unexplained injuries, the juvenile court removed both the infant and his older sister from parental custody.  (*Id.* at p. 145.)  The appellate court reversed as to the older sister.  After all, there was no evidence that she was ever a victim of abuse in the parents' home, she was articulate and attended school, and there was "abundant evidence that [the parents] were good parents who enjoyed a healthy relationship."  (*Id.* at p. 147.)  In addition, there was no evidence of domestic violence between them; neither parent had substance abuse problems; and there was no evidence that either parent "suffered from mental health conditions, developmental delays or other social issues that often are at the root of dependency cases and might place children at continuing risk in the home."  (*Ibid.*)  Furthermore, the parents "started services at the earliest opportunity, showed progress in the services and had meaningful and productive visits with the children."  (*Id.* at pp. 147–148.)

For the reasons set forth above, the factual scenario in *In re Hailey T.* is a far cry from the situation in the instant case.

**DISPOSITION**

Mother's appeal concerning David and J.G. is dismissed.  In all other respects, the juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

23